UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-778(DSD/JMM)

FleetBoston Robertson Stephens, Inc. (formerly BancBoston Robertson Stephens), a Massachusetts corporation,

Plaintiff,

v.

**ORDER**

Innovex, Inc., a Minnesota corporation, and ADFlex Solutions, Inc., a Delaware corporation,

Defendants.

Karen E. Wilson, Esq., David J.F. Gross, Esq. and Faegre & Benson, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402, counsel for plaintiff.

Terrence J. Fleming, Esq., Kim Ruckdschel-Haley, Esq. and Lindquist & Vennum, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court on plaintiff's motion for summary judgment and defendants' motion to prohibit use of evidence. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants plaintiff's motion, the court denies plaintiff's request for attorney fees and denies defendants' motion.

FILED 11-15-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 11-15-01
Deputy Clerk's Initials ______

**BACKGROUND**

Defendant ADFlex Solutions, Inc. ("ADFlex") manufactures components used in computer and communications products. In 1998, ADFlex was experiencing cash shortages and declining financial results. ADFlex asked Robertson Stephens ("Robertson Stephens," formerly known as "FleetBoston Robertson Stephens"), a financial services and investment banking firm, for its assistance in securing additional capital. Over the next several months, Robertson Stephens consulted with ADFlex and attempted to locate investors for proposed private placements by ADFlex of equity or convertible securities. None of these potential investors pursued an investment in ADFlex.

In the spring of 1999, ADFlex explored the possibility of a merger with several other parties, including defendant Innovex, Inc. ("Innovex"). Over the next several weeks, the chief executive officers ("CEO") of ADFlex and Innovex negotiated a purchase price for ADFlex's stock. During the negotiations period, Robertson Stephens continued to advise ADFlex regarding its strategic options, including the potential merger with Innovex. ADFlex and Innovex merged in September 1999, resulting in the sale of 100 percent of ADFlex's voting stock.

Prior to the merger, on June 7, 1999, Robertson Stephens and ADFlex executed a written engagement agreement. The engagement agreement set forth the terms of an "exclusive engagement" for

Robertson Stephens "to provide financial advisory and investment banking services to [ADFlex] in connection with its exploration of various strategic alternatives available to it, including a possible sale of, or business combination involving (including, a merger, reverse merger or merger of equals)." (Wilson Aff., Ex. A.) Under the agreement, Robertson Stephens would receive a fee of $800,000. The fee portion of the agreement provides as follows:

> If the Transaction is completed, the Company agrees to pay to [Robertson Stephens] a "Transaction Fee" equal to $800,000. A transaction (or series of related transactions) resulting in the sale of 50% or more of the Company's voting stock or assets to another party represents a concluded Transaction for determining when the Transaction fee is payable.

Id.

The parties dispute the terms of the fee agreement. Plaintiff claims that the parties agreed that Robertson Stephens would receive a flat fee of $800,000 if ADFlex closed on a transaction resulting in the sale of 50 percent or more of ADFlex's voting stock or assets. (Pl.'s Mem. Law Supp. Mot. Summ. J. at 1.) Because the ADFlex/Innovex merger resulted in the sale of 100 percent of ADFlex's voting stock, plaintiff asserts that it is entitled to the $800,000 fee under the clear terms of the contract. Defendants, on the other hand, allege that Robertson Stephens' compensation was for the services that it provided. Defendants claim that Robertson Stephens is not entitled to the full $800,000

because it did not perform the services for which ADFlex contracted. (Defs.' Mem. Law Opp'n Mot. Summ. J. at 5.) Specifically, defendants refuse to pay plaintiff because they contend that the Robertson Stephens' fee is above industry standards, that Robertson Stephens' work was of poor quality and that Robertson Stephen's affiliation with ADFlex's primary lender breached a fiduciary duty to ADFlex. (Defs.' Mem. Law Opp'n Mot. Summ. J. at 12-13, 24, 26.)

As a result of this dispute, plaintiff filed suit against defendants to recover the $800,000 fee. After filing suit, David Flower, plaintiff's counsel, contacted Steve Sanghi, ADFlex's Chairman of the Board ("COB") and CEO at the time the companies merged, to discuss the ADFlex/Innovex merger, ADFlex's relationship with Robertson Stephens, and the dispute between Robertson Stephens, ADFlex and Innovex. Flower also asked Sanghi whether he would complete an affidavit or declaration regarding these matters, and Sanghi stated that he would. (Pl.'s Br. Opposing Defs.' Mot. Prohibit Use of Evidence at 4.) Karen Wilson, co-counsel for plaintiff, later contacted Sanghi to ask him to submit the declaration. Plaintiff's counsel then had one or two other conversations with Sanghi. (Fleming Aff., Ex. D, Sanghi Depo. at 50.)

The parties dispute the contents of the conversations. Defendants claim that plaintiff's counsel did not ask Sanghi

whether he was represented by ADFlex's counsel or his own counsel. Defendants further claim that they did not properly inform Sanghi that he could retain counsel, that Robertson Stephens may have adverse interests to his and that they would not ask about privileged information. (Defs.' Mem. Supp. Mot. Prohibit Use of Evidence at 4.)

Plaintiff, however, contends that its counsel asked Sanghi whether he was represented by counsel. Plaintiff also alleges that its counsel informed Sanghi that they represented Robertson Stephens, that Sanghi had no obligation to discuss the ADFlex/Innovex issues with them and that Robertson Stephens would speak with any lawyer he retained before discussing the matter further. (Pl.'s Br. Opposing Defs.' Mot. Prohibit Use of Evidence at 4.) Plaintiff further states that its counsel told Sanghi that Robertson Stephens did not wish to interfere with any communications that Sanghi might have with ADFlex, Innovex or their counsel and that they never asked Sanghi about any privileged communications. (Pl.'s Br. Opposing Defs.' Mot. Prohibit Use of Evidence at 6.)

Defendants now move to prohibit plaintiff from using Sanghi's deposition transcription and declaration in support of its motion for summary judgment and at trial and plaintiff moves for summary

judgment. The court denies defendants' motion and grants plaintiff's motion; the court, however, denies plaintiff's request for attorney fees.

## DISCUSSION

### A. Defendants' Motion to Exclude Evidence

Defendants contend that the court should not consider Steve Sanghi's deposition transcript and declaration in support of its summary judgment motion or at trial because plaintiff's counsel obtained it in violation of Rule 4.2 of the Minnesota Rules of Professional Conduct. The court finds that plaintiff's counsel did not violate Rule 4.2 and allows plaintiff to use Sanghi's deposition transcript and declaration in support of its summary judgment motion.[1]

Rule 4.2 provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." 52 M.S.A., Rules of Prof. Conduct, Rule 4.2 (1985). When the party is an organization, the Rule "prohibits communications by a lawyer for one party concerning the matter in representation with persons having managerial

---

[1] The court concludes that defendants' motion to exclude the deposition transcript and declaration at trial is moot because the court grants plaintiff's motion for summary judgment.

responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." 52 M.S.A., Rules of Professional Conduct, Rule 4.2, Comment (1985).

Although the Eighth Circuit has not settled the issue of whether Rule 4.2 prohibits ex parte communications with former managerial employees of the adverse party, the ABA Committee on Ethics and Professional Responsibility has addressed this issue. (Flower Aff., Ex. A, Contact with Former Employee of Adverse Corporate Party, ABA Formal Op. 91-359 (1991).) The ABA Committee states:

> it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer. Id.

While the ABA's opinion is not binding upon this court, the Eighth Circuit has instructed courts to consider the ABA Code of Professional Responsibility in construing the Minnesota Rules of Professional Conduct. United States v. Agosto, 675 F.2d 965, 969

(8th Cir. 1982)(stating that the district court must consider the ABA Code of Professional Responsibility in supervising members of its bar).[2]

The majority of courts that have considered this matter have reached the same result. See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp., 961 F. Supp. 1288, 1295 (E.D. Mo. 1997)(holding that counsel can interview former unrepresented employee of opposing party) aff'd 132 F.3d 1252 (8th Cir. 1998); Jenkins v. Wal-Mart Stores, Inc., 956 F. Supp. 695, 697 (W.D. La. 1997)(finding that counsel can interview former employee of opposing party so long as they do not discuss information protected by attorney-client privilege); Orlowski v. Dominick's Finer Foods, Inc., 937 F. Supp. 723, 728 (N.D. Ill. 1996)(holding that former employees not included in the rule prohibiting ex parte communications); Concerned Parents of Jordan Park v. Housing Auth.

---

[2] Many bar associations and ethics committees have adopted the ABA's position. See, e.g., Alaska Bar Association Ethics Committee , Ethics Op. 91-1, Communication with Former Employee of Corporation Represented by Counsel; Connecticut Bar Association, Inf. Op. No. 99-43, Interviewing Former Employee of Opponent; Florida State Bar Association, Committee on Professional Ethics, Op. No. 88-14; Illinois State Bar Association, Opinion No. 85-12, Communication With Former Employee of Adverse Party; The Supreme Court of Ohio, Board of Commissioners on Grievances and Discipline, Op. No. 96-1; Oregon State Bar Association Board of Governors, Formal Op. No. 1991-80, Communicating with Represented Persons: Current and Former Employees of Entities Represented by Counsel, Attorney-Client Privilege; Pennsylvania Bar Association Committee on Legal Ethics and Professional Responsibility, Case Law Update to Formal Op. No. 90-142, Ex Parte Contacts With Formal Employees of a Corporate Party; South Carolina Bar Ethics Advisory Committee, Ethics Advisory Op. No. 01-01.

of St. Peterburg, 934 F. Supp. 406, 408 (M.D. Fla. 1996)(finding counsel's ex parte communication with opposing party's former employee is not an ethical violation); Terra Int'l, Inc. v. Missippi Chem. Corp., 913 F. Supp. 1306, 1315 (N.D. Iowa 1996)(holding that defendant was entitled to communicate with plaintiff's former employees, unless they were represented by plaintiff's counsel); Aiken v. Business and Industry Health Group, Inc., 885 F. Supp. 1474, 1476 (D. Kan. 1995)(holding that the rule prohibiting ex parte communication does not apply to ban ex parte contact with former employees of an organizational party to the litigation).

A minority of courts have prohibited contact with former employees of adverse parties. See, e.g., Camden v. Maryland, 910 F. Supp. 1115, 1121 (D. Md. 1996)("The Court holds that a lawyer representing a client in a matter may not, subject to few exceptions, have ex parte contact with the former employee of another party interested in the matter when the lawyer knows or should know that the former employee has been extensively exposed to confidential client information of the other interested party.").

Still other courts have adopted a flexible approach. See, e.g., Olson v. Snap Products, Inc., 183 F.R.D. 539, 544-45 (D. Minn. 1998)(applying a flexible approach to prevent privileged information from being disclosed to the adverse party); Spencer v.

Steinman, 179 F.R.D. 484, 491 (E.D. Pa. 1998)(communications between plaintiff's counsel and former defense counsel did not violate Pennsylvania Rules of Professional Conduct because plaintiff's counsel was not seeking information protected by attorney-client privilege, and former counsel for defendant did not disclose any privileged or confidential information to plaintiff's counsel.).

In Olson v. Snap Products, Inc., the court explained that Rule 4.2 recognizes "the underlying policy of Rule 4.3 and 4.4 of the Minnesota Rules of Professional Conduct, by prohibiting an attorney from unfairly taking advantage of unrepresented parties when acting on behalf of a client, while still allowing leeway for the proper search for truth." Id. The court therefore adopted a flexible analysis of Rule 4.2, holding that the key factor in evaluating the propriety of a lawyer's contact with a former unrepresented employee of an adverse party is the likelihood that privileged information will be disclosed to an opponent in litigation. Olson, 183 F.R.D. at 545.

Defendants in Olson claimed that plaintiff's lawyer violated Rule 4.2 when he contacted defendant's former CEO to discuss matters relevant to the litigation. In evaluating whether these contacts with defendant's former employee violated Rule 4.2, the court considered whether plaintiff's counsel actually gathered privileged information. The court concluded that these contacts

did not violate Rule 4.2 because plaintiff's counsel "did not ask [the ex-employee] to discuss matters that would be privileged, and there is no evidence that privileged matters were disclosed or discussed." Id. at 545.

Here, as in Olson, the court adopts a flexible mode of analyzing Rule 4.2. Similar to plaintiff's counsel in Olson, plaintiff's counsel in this case contacted defendants' former CEO to discuss matters relevant to the litigation. At no point, however, did plaintiff's counsel solicit any privileged information and Sanghi did not relate such information. Thus, like plaintiff's lawyer in Olson, plaintiff's lawyers in this case did not violate Rule 4.2. The court therefore denies defendants' motion to exclude evidence.[3]

**B. Plaintiff's Motion for Summary Judgment**

**1. Standard for Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[3] The court notes that statements taken in violation of Rule 4.2 are "subject to exclusion," but exclusion is not required. State v. Ford, 539 N.W.2d 214 (Minn. 1995); State v. Willis, 559 N.W. 693 (Minn. 1997)(providing that the exclusion of evidence is not required for violation of Rule 4.2). Thus, even if the court were to find that plaintiff's counsel had violated Rule 4.2, the court would not have excluded the disputed evidence.

to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252. In a contract dispute, such as this one, summary judgment may be granted only where the language of the contract is unambiguous. Nowak v. Ironworks Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996).

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**2. The Engagement Agreement**

Plaintiff claims that it is entitled to the $800,000 fee under the unambiguous terms of the engagement agreement. Defendants, on the other hand, claim that plaintiff is not entitled to the fee because the fee is above industry standards, because of the quality of plaintiff's work and because plaintiff breached its fiduciary duty. Since the court finds that plaintiff is entitled to the $800,000 under the agreement's clear terms, the court grants plaintiff's motion for summary judgment.

The Engagement Agreement between ADFlex and Robertson Stephens provides that it shall be governed by and construed in accordance with the laws of the State of New York. Under New York law, whether a written contract is unambiguous is a question of law for the trial court. Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir. 1996). A contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Cooper v. Gottlieb, 2000 WL 1277593 at *5 (S.D.N.Y. Sept. 8, 2000)(Ex. P)(quoting Sayers v. Rochester Tel. Corp. Supplemental Management Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)(applying New York law).

In Chase Manhattan Bank, N.A. v. Remington Products, Inc., Chase Manhattan Bank ("Chase") and Remington Products ("Remington")

entered an engagement agreement. 865 F. Supp. 194 (S.D.N.Y. 1994). The fee portion provided that Remington would pay Chase if a "transaction was consummated" during the term of the agreement or within 12 months thereafter. Id. at 197. Remington claimed that Chase did not provide the services required under the agreement and refused to pay Chase its fee. Id. at 198. The court found that the sole prerequisite to payment listed in the engagement agreement was "the consummation of a Transaction (or the signing of an agreement that resulted in a Transaction)" and that Chase had submitted extensive evidence of the services that it provided to Remington. Id. The court therefore concluded that Chase was entitled to payment under the unambiguous terms of the engagement agreement and granted Chase's motion for summary judgment. Id. at 199.

As in Chase, the engagement agreement between Robertson Stephens and ADFlex unambiguously states that plaintiff is entitled to $800,000 upon the sale of 50 percent or more of ADFlex's voting stock or assets. (Wilson Aff., Ex. A.) This is the only condition precedent to payment under the agreement and it was satisfied. Not only is the agreement's language unambiguous, but the record also clearly illustrates that the parties to the agreement intended ADFlex to pay Robertson Stephens the fee upon the completion of the merger. See Hooper Assocs., LTD. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989)("Words in a contract are to be

construed to achieve the apparent purpose of the parties."). Sanghi, who signed the agreement on ADFlex's behalf, testified that agreement's terms clearly provide that ADFlex would pay Robertson Stephens its $800,000 fee if a merger transaction was completed. (Wilson Aff., Sanghi Depo., Ex. L at 12.) Don Frederick, ADFlex's chief financial officer at the time, also testified that the terms unambiguously provided that plaintiff would receive $800,000 upon the completion of a successful merger. (Wilson Aff., Frederick Depo., Ex. I at 13-14.)

Even if the engagement agreement had conditioned payment upon Robertson Stephens performing services on ADFlex's behalf, as defendants assert, the record offers ample evidence that Robertson Stephens provided substantial assistance and advice to ADFlex in negotiating and closing the Innovex/ADFlex merger.[4] Robertson Stephens performed the following services in connection with the merger:

> (1) During Sanghi's initial negotiations with Murnane, Robertson Stephens advised the board and Sanghi about ADFlex's strategic and financial alternatives to ascertain whether an acquisition was ADFlex's only feasible option.

---

[4] The parties executed the engagement agreement when both parties understood that ADFlex and Innovex already had negotiated a purchase price for the merger. (Sanghi Depo., Ex. L at 11.) The fact that defendants now suggest that plaintiff is not entitled to its fee because it did not introduce the ADFlex to Innovex or negotiate the purchase price is therefore inconsistent with the parties' clear understanding at the time they entered into the agreement.

(Tung Depo., Ex. J at 56; Sanghi Depo., Ex. L at 27; Ex. D at 17.)

(2) Ms. Tung and her colleagues provided various analyses of Innovex's purchase price offers, including information on comparable transactions to aid Sanghi in his price negotiations with Innovex. Such analyses included comparable public company trading multiples, comparable transaction multiples, premiums paid in similar transactions, the probable effect of the merger on Innovex's pro-forma earnings, and discount cash-flow analyses. (Tung Depo., Ex. J at 56-57.)

(3) Robertson Stephens helped with the due diligence process and assisted Sanghi and the ADFlex board in understanding more about Innovex by looking at the trading of Innovex stock and how it traded relative to its peer group, reviewing the public documents and disclosures available on Innovex's business, management, operations and financials. (Tung Depo., Ex. J at 57; Sanghi Depo., Ex. L at 27).

(4) Robertson Stephens rendered a written fairness opinion on July 1, 1999 and presented its opinion to the ADFlex board on June 30, 1999. (Sanghi Depo., Ex. L at 28).

(5) Robertson Stephens negotiated the terms of the definitive merger agreement and other ancillary merger documents with Needham & Co., Innovex's financial advisor, and helped ADFlex evaluate various merger terms that Innovex was proposing. (Tung Depo., Ex. J at 58; Sanghi Depo., Ex. L at 29-32.)

(6) Robertson Stephens worked with ADFlex's legal counsel to review the tender offer agreement documents. (Tung Depo., Ex. J at 58-59.)

(7) Robertson Stephens worked with ADFlex to craft the disclosures regarding the merger

> that were to be made to employees, customers, shareholders and to the public. (Tung Depo., Ex. J at 58; Sanghi Depo., Ex. L at 35.)

ADFlex nevertheless refuses to pay Robertson Stephens because its asserts that its fees are above industry standards, because of the quality of plaintiff's services, and because it claims that plaintiff breached a fiduciary duty. The court is unpersuaded by these three arguments and addresses each one in turn.

First, defendants refuse to pay plaintiff the $800,000 fee because defendants contend that plaintiff's fee is "exorbitant in light of industry standards." The court finds defendants' argument unpersuasive in light of the engagement agreement's clear terms. Klos v. Polskie Linie Lotnicze, 133 F.3d 164 (2d Cir. 1987)(stating that intent of parties governs contract interpretation and, when contract is unambiguous, the contract language alone is taken to express the parties intent.) As plaintiff correctly notes, defendants now cannot ask the court to rewrite the agreement's terms because defendants believe that a lower fee would be more fair.

Defendants also refuse to pay plaintiff because defendants allege that plaintiff breached the agreement by failing to perform. Under New York law, if a non-breaching party elects to continue to perform a contract after another party breaches, then the non-breaching party may not later renounce its election to continue and

seek to terminate based on the prior breach. Lazard Freres & Co. v. Crown Sterling Management, Inc., 901 F. Supp. 133, 136 (S.D.N.Y. 1995).

In Lazard Freres & Co. v. Crown Sterling Management, Inc., plaintiff agreed to serve as defendant's "exclusive investment banker and financial advisor" and to assist defendant in restructuring its debts. The fee agreement provided that if the defendant successfully restructured its debts, plaintiff would be entitled to its fees, even if plaintiff was not responsible for the restructuring. Id. at 134. After the restructuring, defendant refused to pay plaintiff's fee, claiming that plaintiff failed to perform. Id. at 135. The court found that defendant presented no evidence that it notified plaintiff that it considered plaintiff to have breached the contract. Id. at 136. The court therefore concluded that even if plaintiff failed to perform, defendant had elected to continue with the agreement and was obligated to pay plaintiff. Id.

As in Lazard, defendants refused to pay plaintiff's fee, claiming that plaintiff failed to sufficiently perform. Yet defendants presented no evidence that it notified plaintiff that it considered plaintiff to have breached the contract or even that it was concerned about plaintiff's services prior to the merger. To the contrary, Sanghi, ADFlex's then COB and CEO, testified that he was "extremely" satisfied with plaintiff's services and expected

that plaintiff would be paid its $800,000 fee after ADFlex and Innovex merged. (Wilson Aff., Sanghi Depo., Ex. L at 36.) Frederick also testified that he could not recall any conversations with anyone prior to the date he left the company in which anyone raised any concerns about paying the fee. (Wilson Aff., Frederick Depo., Ex. I at 15.) Thus, even if plaintiff had failed to perform some of its services as required under the engagement agreement, the court concludes that defendants elected to continue with the agreement and is obligated to pay plaintiff.

Defendants further claim that it should not pay plaintiff the $800,000 because plaintiff breached the fiduciary duty it owed to defendant ADFlex. This claim fails based on the plain language of the engagement agreement, which clearly states that plaintiff and defendant ADFlex did not form a fiduciary relationship. In particular, the engagement agreement states: "It is understood that BRS' responsibility to the company is solely contractual in nature and that BRS does not owe the company, or any other party, any fiduciary duty as a result of its engagement." (Wilson Aff., Ex. A at 3.)

Moreover, defendants provide no evidence to support their contention that plaintiff owed defendant ADFlex a fiduciary duty, despite the contract's language. Although defendants cite Frydman & Co. v. Credit Suisse First Boston, 272 A.D.2d 236 (N.Y. S. Ct. 2000) and Weiner v. Lazard Freres & Co., 241 A.D.2d 114 (N.Y.A.D.

1 Dept. 1998), these cases do not support defendants' position because they do not hold that a court should impose a fiduciary duty on parties that have expressly contracted that they do not contemplate any fiduciary obligations owed to one another. Based on the unambiguous language of the engagement agreement, the court therefore finds that plaintiff owed defendants no fiduciary duty.

**3. Indemnification**

Plaintiff claims that it is entitled to the attorney fees and costs that it incurred in this action pursuant to its indemnification agreement with ADFlex, while defendants claim that the indemnification agreement does not cover fees incurred in an action between plaintiff and defendants. Pursuant to the express terms of this agreement, the court concludes that plaintiff is not entitled to attorney fees.

Under New York law, a prevailing party may not collect attorney fees from the losing party unless such an award is authorized by an agreement between the parties, statute or court rules. Bonnie & Company Fashions, Inc. v. Bankers Trust Co., 955 F. Supp. 203, 217 (S.D.N.Y. 1997) A contract's language must make the intent to provide for attorney fee indemnification between contractual parties "unmistakably clear." Id. (citing Hopper, 548 N.E.2d at 903). Where an attorney fee provision is not "unmistakenly clear," courts read the provision to apply only to

legal expenses incurred through litigation with noncontractual or third parties. Id. at 218.

In Bonnie & Company Fashions, Inc., plaintiffs sued defendant for breach of a factoring agreement and defendant claimed that plaintiffs were liable for defendant's litigation expenses. Id. at 215. The attorney fees provision of the factoring agreement stated that plaintiffs would indemnify defendants for:

> all costs and expenses incurred by [defendant] in protecting, maintaining, preserving or enforcing the sale, assignment, pledge, lien and security interests granted to [defendant] hereunder, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or in any way related to this Agreement....

Id. at 218. Plaintiffs claimed that the agreement's attorney fees provision applied only to third-party lawsuits, not to lawsuits between contractual parties. Id. at 215. The court concluded that the factoring agreement's language did not satisfy the "unmistakably clear" standard because the text could easily be read to protect defendant from third-party claims and could not support an inference that plaintiffs sought to indemnify defendant from claims between the parties themselves. Id. at 219. The court therefore denied defendant's request for attorney fees.

In Hooper Assocs., Ltd., after plaintiff successfully sued for breach of contract, plaintiff sought attorney fees under the contract's indemnity clause. 548 N.E.2d 903. The indemnification

portion provided that defendant must indemnify plaintiff for reasonable counsel fees, but did not indicate the scope of this promise. Id. at 905. The court found that the agreement did not have "unmistakably clear" language permitting plaintiff to recover attorney fees from defendant. Id. The court therefore held that the indemnification clause related only to third-party claims and did not permit plaintiff to recover attorney fees from defendant. Id. at 906.

As in Bonnie & Company Fashions, Inc. and Hooper Assocs., Ltd., plaintiff claims that it is entitled to attorney fees under the indemnification portion of the engagement agreement. The language of the parties' indemnification agreement states that defendant agrees to:

> indemnify and hold harmless BRS ... ("Indemnified Person"), from and against any losses, claims, damages, expenses and liabilities on actions in respect thereof collectively, ("Losses") as they may be incurred, including all reasonable legal fees and other expenses incurred in connection with investigating, preparing, defending,... any losses, whether or not in connection with any pending or threatened litigation in which any Indemnification Person is a named party ... which are related to or arise out of any act, omission, transaction or event contemplated by the Agreement.

(Wilson Aff., Ex. A.) This language does not expressly cover claims between the parties themselves. Because the language is not "unmistakably clear" that the plaintiff can recover attorney fees from defendants, the court concludes that the indemnification

provision applies only to third-party claims. The court therefore denies plaintiff's request for attorney fees.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion to exclude evidence is denied;

2. Plaintiff's motion for summary judgment is granted; however, plaintiff's request for attorney fees is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 14, 2001

David S. Doty, Judge
United States District Court

# Please forward this announcement to the recipient of this fax.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.